Norvell Estate.

Argued March 23, 1964. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

428

R. J. Cleary, for appellants.

Robert B. McKinley, with him John G. Frazer, Jr., and Marsh, McKinley & Bowman, and Kirkpatrick, Pomeroy, Lockhart & Johnson, for appellees.

OPINION BY MR. JUSTICE ROBERTS, October 7, 1964:

Florence Tack Norvell died August 24, 1921. Her will, dated August 9, 1919, created a trust out of which the present controversy arises. Appellants are life tenants under the trust and are entitled by its provisions to receive all of the income. The trust also establishes alternative remainders over in named and unascertained persons.[1]

On March 4, 1960, the trustees filed their fifth account. The petition for distribution, filed June 1, 1960, requested the court to approve distribution to the life tenants of the proceeds from the sales of stock subscription rights and of certain shares of stock received by the trustees as stock dividends.[2] Following our decision in Catherwood Trust, 405 Pa. 61, 173 A. 2d 86 (filed July 26, 1961), the trustees withdrew the

---

[1] The life tenants' father is one of the contingent remaindermen and joins them in this appeal.

[2] The sales of rights covered the period 1952-58. All stock dividends were well in excess of six percent of the outstanding shares of that class.

suggested schedule of distribution. On December 20, 1961, the trustees filed a supplemental petition for distribution and took the position that, in view of *Catherwood,* "the entire apportionment matters referred to in the Petition for Distribution need not be presented."

The Orphans' Court of Allegheny County, by decree of April 29, 1963, approved the distribution to principal of cash from the sale of rights and the shares of stock received as stock dividends. This allocation was made under the Principal and Income Act of July 3, 1947, P. L. 1283, which *Catherwood Trust,* supra, held constitutionally applicable to trusts created prior to the effective date of the Act.[3]

Specifically, this appeal challenges the constitutional validity of Sections 3(1), 5(1) and 5(2) of the Act. Section 3(1) provides: "All . . . dividends on corporate shares, payable other than in shares of the corporation itself of the same kind and rank as the shares on which such dividend is paid, . . . shall be deemed income, unless otherwise expressly provided in this act."[4]

---

[3] Since the trust was created prior to the enactment of the Principal and Income Act, and since all the stock dividends and all subscription rights sales occurred after the enactment of the Principal and Income Act, the statutory rules classifying such receipts as principal was held to govern this transaction. Since the stock dividends here involved all exceeded this Court's "stock dividend of 6% or less" rule in *Pew Trust,* 411 Pa. 96, 191 A. 2d 399 (1963), that rule does not apply.

[4] Of course, the settlor may set out his or her own definition of what is meant by "income," in which case §2 of the Act provides that the settlor's meaning shall prevail and the statutory definitions do not apply. P. L. 1283, §2, 20 P.S. §3470.2.

Chief Justice BELL noted in *Pew Trust,* supra, note 3, that "the object and purpose of this proviso was undoubtedly to preserve to every settlor and every testator his basic centuries old right to determine to whom his property should go, and how—whether outright, or conditionally, or in trust, i.e., what he wanted to go to his life tenant as income and what to his remainderman as principal." 411 Pa. at 105-06, 191 A. 2d at 405.

Prior to September 30, 1963, Section 5(1) directed: "All dividends on shares of a corporation, forming a part of the principal, which are payable in the shares of the corporation itself of the same kind and rank as the shares on which such dividend is paid shall be deemed principal. . . ."[5]

Section 5(2) reads: "All rights to subscribe to the shares or other securities or obligations of a corporation, accruing on account of the ownership of shares or other securities in such corporation, and the proceeds of any sale of such rights shall be deemed principal. . . ."

The alleged infirmity is one of deprivation of property without due process of law. It is vigorously contended that the Principal and Income Act, as applied to this trust created years prior to the effective date of the Act, deprives the life tenants of their property without due process, in violation of Article I, §§1 and

---

[5] Subsequent to our decision in *Pew Trust*, supra, note 3 (filed May 29, 1963), holding that stock dividends of "6% or less" of the outstanding shares of the same class on the record date are applicable to income, this sentence was amended by Act of August 1, 1963, P. L. 442, §1, 20 P.S. §3470.5(1), effective September 1, 1963, and provides: "Corporate distributions made to a trustee in the shares of the distributing corporation, however described or designated by the distributing corporation, shall be deemed principal but if the number of shares of any class distributed to shareholders of such class is six percent (6%) or less of the number of shares of that class outstanding on the record date for such distribution, the shares so distributed shall be deemed income."

Both our ruling in *Pew* and the provisions of the 1963 amendment declare that only stock dividends of 6% or less are income. Each such dividend is considered separately without reference to the trust or corporate year. In contrast, the New York statute allocates to income the first 6% of larger dividends and limits the total receivable income of this type to 6% in any particular year. See N. Y. Pers. Prop. Law §17-a(3) (effective June 1, 1965) ; Second Report of the New York Commission on the Modernization, Revision and Simplification of the Law of Estates 322 (1963).

9 of the Pennsylvania Constitution and the Fourteenth Amendment to the Constitution of the United States.

Appellants urge that, as life tenants, they are entitled to all the return derived from the principal of the trust and that the first sentence of Section 5(1), directing that "all dividends on shares . . . shall be deemed principal," establishes a conclusive statutory presumption contrary to actual fact and violates the constitutional due process provisions. Substantially the same attack is made on the first sentence of Section 3(1) to the extent that it excludes from income stock dividends (of the same kind and rank as the shares on which paid).

Appellants assert, and we agree, that the contentions presently advanced were not raised or directly settled in *Catherwood*. We do feel, however, that the implications of that decision are unmistakably pertinent and persuasive here.

In essence, appellants argue that the Legislature has improperly and conclusively defined principal so as to preclude the life tenants from proving that the stock dividends here are "in fact" income. This position appears based on the premise that income has a distinct, fiscal meaning (presumably, that accorded the term under the Pennsylvania Rule of Apportionment prior to the Principal and Income Act). And appellants insist that the statute may not, by means of an irrebuttable presumption, constitutionally preclude them from establishing that the distributions in controversy fall within the meaning they seek to give income.

Appellants place their heaviest reliance on *Heiner v. Donnan*, 285 U.S. 312, 52 S. Ct. 358 (1932), but that reliance is unfounded, especially since *Heiner* dealt with a statute establishing, in effect, a rule of evidence. There the statute provided that gifts in excess of $5,-000 made within two years of the donor's death were

to be deemed as having been made "in contemplation of death." No opportunity was afforded to prove that a gift within the two year period was not so made. Accordingly, the value of the gift was taxable under other provisions of the taxing statute.

It is important to note that the amount of the gift was not taxable in *Heiner* unless made in contemplation of death, and that "contemplation of death" had a meaning which Congress did not seek to change. The Supreme Court held the statute invalid as "an attempt, by legislative fiat, to enact into existence, a *fact* which here does not, *and cannot be made to,* exist in actuality . . . ." (Emphasis supplied.) 285 U.S. at 329, 52 S. Ct. at 362. Moreover, the Supreme Court made it quite clear that the statute was not intended to operate as a change in the substantive law, i.e., that there was no congressional intention to tax gifts not made in contemplation of death. 285 U.S. at 328-30, 52 S. Ct. at 362-63.

It seems clear to us that the Principal and Income Act does not establish, as appellants contend, a rule of evidence, i.e., a presumption contrary to the actual facts. What the statute expressly does is to set forth a substantive rule of law defining income and principal. See 4 Wigmore, Evidence §§1353-54 (3d ed. 1940); 9 Wigmore, op. cit. supra, §2492; cf. *United States v. Carlisle,* 234 F. 2d 196, 199 (5th Cir.), cert. denied, 352 U.S. 841, 77 S. Ct. 63 (1956); *Bowers v. United States,* 226 F. 2d 424, 428 (5th Cir. 1955); *United States v. Jones,* 176 F. 2d 278, 288 (9th Cir. 1949); *City of New Port Richey v. Fidelity & Deposit Co.,* 105 F. 2d 348, 351 (5th Cir. 1939); *Commonwealth v. Brue,* 284 Pa. 294, 296, 131 Atl. 367, 368 (1925).

In *City of New Port Richey v. Fidelity & Deposit Co.,* supra, an argument similar to that presently advanced was rejected. The court said: "We recognize that the legislature cannot make certain facts conclu-

sive proof of another ultimate fact when there is no logical connection or probability in experience to connect them. But the real legislative intent may not be to make a rule of evidence, but a rule of substantive law, *and if the legislature may constitutionally do the latter,* the form of the words used will not defeat the intent." (Emphasis supplied.) 105 F. 2d at 351.

It is clear that the Legislature, by the 1947 Act, intended to, and did, change the substantive law by declaring that certain kinds and classes of stock dividends constitute principal. Thus, a new definition of income was statutorily established.[6] Here, unlike *Heiner,* the statute enacts into existence, not a fact, but a definition of a term theretofore subject to judicial determination.

We are therefore led to the question whether the Legislature possesses constitutional authority to define income. This determination, in turn, depends on whether income, as used in the statute, enjoys such a fixed definitional status that it may not be legislatively disturbed. In *Catherwood* we attributed to trust income no such undisturbable status.

We held in *Catherwood* that life tenants have no vested interest in a court-made rule of apportionment. 405 Pa. at 72-73, 77, 173 A. 2d at 91, 93. Although the life beneficiaries there (as the life tenants here) enjoyed a vested right to the income of the trust, no vested right exists in the functional, operational or definitional methods of ascertaining from time to time what constitutes such income. Due process does not mandate that prior decisions or rules remain effective and controlling forever. Thus, it is settled that there is no vested interest in a definition or method of ascertaining income. This conclusion is supported by

---

[6] "This section [5(1)] abolishes the so-called 'Pennsylvania' rule of apportionment of dividends, and the basic significance of 'intact value.' " 20 P.S. §3470.5(1), Commission's Comment.

compelling reasoning and the clear weight of authority. E.g., *In re Gardner's Trust,* 266 Minn. 127, 123 N.W. 2d 69 (1963); *In Matter of Trust of Arens,* 41 N.J. 364, 197 A. 2d 1 (1964); *Will of Allis,* 6 Wis. 2d 1, 94 N.W. 2d 226 (1959); Bogert, Trusts and Trustees §847, at 505-06 (2d ed. 1962); Bogert, "Uniform Principal and Income Act Revised," 101 Trusts & Estates, 787, 788 (1962); King, "Uniform Principal and Income Act, §5: Constitutionality of Its Retroactive Applications," 1960 Wash. U.L.Q. 339; Niles, "Fosdick, Cunningham and Chaos," 98 Trusts & Estates 924, 927-28 (1959); Scott, "Principal or Income?" 100 Trusts & Estates 180, 250-51 (1961); Second Report of the New York Commission on the Modernization, Revision and Simplification of the Law of Estates, 272 n.352, 275 (1963); 112 U. P. L. Rev. 290, 292 n.14 (1963) and other authority cited therein; see *Farmers Bank & Capital Trust Co. v. Hulette,* 293 S.W. 2d 458 (Ky. 1956); *Langdell v. Dodge,* 100 N.H. 118, 122 A. 2d 529 (1956); cf. *Demerest v. City Bank Farmers Trust Co.,* 321 U.S. 36, 64 S. Ct. 384 (1944).

We have no hesitancy in concluding that the Legislature has the power to define income.[7]  In the light of the complexity of current corporate finance, the definition of income is a function which the Legislature is well suited to perform. "In the area of apportionment of stock distribution between income and corpus beneficiaries, the elements of fairness, practicality and changing conditions dictate that freedom be given to lawmaking bodies to promulgate rules applicable to existing trusts." King, supra, at 357. See

---

[7] It is common experience that "income" is a term which is, and always has been, defined differently for various purposes by governmental agencies, regulatory bodies, taxing authorities, legislators, accountants, securities analysts, bankers, financial writers, lawyers and laymen.

also BURKE, J., in *Matter of Fosdick,* 4 N.Y. 2d 646, 655, 176 N.Y.S. 2d 966, 973, 152 N.E. 2d 228, 233 (1958) : "[T]hat function [altering definitions in this area] is for the Legislature alone."

In the use of its definitional powers, of course, the Legislature may not act arbitrarily. *Nebbia v. New York,* 291 U.S. 502, 537, 54 S. Ct. 505, 516 (1934); *Maurer v. Boardman,* 336 Pa. 17, 25, 7 A. 2d 466, 473 (1939), aff'd, 309 U.S. 598, 60 S. Ct. 726 (1940). In the face of the generally known and experienced difficulty, complexity and uncertainty under the prior rule of apportionment in ascertaining the "intact value" of designated shares of stock at a given time, the Legislature acted to provide for a fairer, more orderly and more uniform apportionment between income and principal.[8] The particular definitions which the Legislature adopted by the 1947 Act represent what that body determined to be a pragmatic necessity for a current, definite, more understandable and more workable rule of fair apportionment. Such action by the Legislature, providing for remedial and commercially useable standards, is an entirely desirable legislative function. Legislation based on such broad public policy and realistic considerations is entirely proper and manifestly reasonable. The absence of arbitrariness is further attested to by the fact that the 1947 Act, in effect, basically adopts the long-established and well-regarded "Massachusetts Rule of Apportionment" embracing substantially the same definitions.[9] The ra-

---

[8] The difficulties are aggravated by current methods of corporate financing, changes in capital and share structure and varying procedures for corporate distributions.

[9] The Massachusetts Rule formed the basis for §5 of the Uniform Principal and Income Act. 112 U. Pa. L. Rev. 290, 292 n.18 (1963); Second Report of the New York Commission on the Modernization, Revision and Simplification of Estates 239 (1963). In turn, the Uniform Act was adopted by the 1947 Pennsylvania Act.

tionale behind that rule is, in our view, a reasonable one, based on substantial considerations. That rule has received approval (at one time or another) in a great many jurisdictions, either by judicial decision[10] or by legislative action.[11] Such overwhelming support for the rationale on which our statute is based confirms our view of its reasonableness.

Appellants make a further argument. They suggest Sections 3(1) and 5(1) of the Act are void because they are repugnant to the definitions in Section 1 of the Act, especially the definitions of "principal" and "income." There "principal" is defined as "any

---

[10] See *First Nat'l Bank v. Hill*, 241 Ala. 606, 4 So. 2d 170 (1941); *Spooner v. Phillips*, 62 Conn. 62, 24 Atl. 524 (1892); *McLane v. Cropper*, 5 App. D.C. 276 (1895); *DeKoven v. Alsop*, 205 Ill. 309, 68 N.E. 930 (1903); *Powell v. Madison Safe Deposit & Trust Co.*, 208 Ind. 432, 196 N.E. 324 (1935); *Bowles v. Stilley's Ex'r*, 267 S.W. 2d 707 (Ky. 1954); *Thatcher v. Thatcher*, 117 Me. 331, 104 Atl. 515 (1918); *Minot v. Paine*, 99 Mass. 101 (1868); *In re Joy's Estate*, 247 Mich. 418, 225 N.W. 878 (1929); *Hayes v. St. Louis Trust Co.*, 317 Mo. 1028, 298 S.W. 91 (1927); *United States Trust Co. v. Cowin*, 121 Neb. 427, 237 N.W. 284 (1931); *Langdell v. Dodge*, 100 N.H. 118, 122 A. 2d 529 (1956); *Humphrey v. Lang*, 169 N.C. 601, 86 S.E. 526 (1915); *Lamb v. Lehmann*, 110 Ohio St. 59, 143 N.E. 276 (1924); *Rhode Island Hosp. Trust Co. v. Tucker*, 51 R.I. 507, 155 Atl. 661 (1931); *Kirby v. Kirby*, 68 S.D. 612, 5 N.W. 2d 405 (1942); *Bergin v. Bergin*, 159 Tex. 83, 315 S.W. 2d 943 (1958); *Kaufman v. Charlottesville Woolen Mills*, 93 Va. 673, 25 S.E. 1003 (1896); *Security Trust Co. v. Rammelsburg*, 82 W.Va. 701, 97 S.E. 122 (1918).

The Supreme Court of the United States has made approving use of the rule. *Gibbons v. Mahon*, 136 U.S. 549, 10 S. Ct. 1057 (1890).

The present Restatement of Trusts also adopts the Massachusetts Rule. Restatement (2d), Trusts §236(b) (1959).

See also Flickinger, "A Trustee's Nightmare: Allocation of Stock Dividends Between Income and Principal," 43 B.U.L. Rev. 199, 207 (1963); Report of the New York Commission, supra, note 9, at 238-39.

[11] See Flickinger, supra, note 10, at 248; Report of the New York Commission, supra, note 9, at 239.

. . . personalty which has been so set aside by the owner thereof . . . that it and any substitutions for it are eventually to be conveyed, delivered or paid to a person, while the return therefrom . . . is in the meantime to be taken or received by . . . another person." "Income" is defined as "the return derived from principal." Appellants urge that the contested stock dividends are not a "substitution" for the assets of principal, but rather are a "return" on principal. Therefore, their argument continues, Sections 3(1) and 5(1), by allotting such stock to principal rather than to income, are repugnant to Section 1 and consequently void.

This reasoning assumes that the words "substitutions" and "income" have meanings unrelated to what follows in the remainder of the Act. We see no inconsistency between the sections. The words "substitutions" in the definition of principal and "return" in the definition of income are, in themselves, not self-contained definitions; they are merely descriptive. What is a "substitution" or a "return" is defined by later sections, including Sections 3(1) and 5(1).

Failing to find the constitutional deficiencies which appellants assert, or any similar or other infirmity, error or defect, the decree below must be affirmed.

Decree affirmed. Each party to pay own costs.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

The majority Opinion states that the constitutional question herein raised was not decided in *Catherwood Trust,* 405 Pa. 61, 173 A. 2d 86, namely, whether the application of the Act of July 3, 1947, to trusts created prior to the effective date of the Act violated Article I, §§1 and 9, of the Constitution of Pennsylvania, and the Fourteenth Amendment to the United States Constitution.

Prior to the Act of (1945) 1947, a life tenant had *a vested property right* in certain stock dividends and

in certain corporate distributions, and it was repeatedly held by this Court that any retroactive application of the Acts to a trust created prior thereto would violate the Constitution of Pennsylvania and the Constitution of the United States.

*Cunningham Estate,* 395 Pa. 1, 149 A. 2d 72; *Warden Trust,* 382 Pa. 311, 115 A. 2d 159; *Pew Trust,* 362 Pa. 468, 67 A. 2d 129; *Crawford Estate,* 362 Pa. 458, 67 A. 2d 124; *Steele Estate,* 377 Pa. 250, 103 A. 2d 409, and *Jones Estate,* 377 Pa. 473, 105 A. 2d 353, directly and specifically hold that the application of the Act of 1947 to trusts created prior thereto, would be unconstitutional. With these decisions, I strongly agree; my views are set forth at length in my Concurring and Dissenting Opinion in *Catherwood Trust,* 405 Pa. 78, 173 A. 2d 94.

For these reasons and under and because of these wise decisions, I dissent.